Filed 5/16/13  P. v. Hughes CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F061613 |
| Plaintiff and Respondent, | (Super. Ct. No. 7045) |
| v. | **OPINION** |
| BERNARD CHARLES HUGHES, | |
| Defendant and Appellant. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Mariposa County.  Richard L. Freeborn, Judge.  (Retired Judge of the Lake Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

Eileen S. Kotler, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Charles A. French and Peter H. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted appellant Bernard Charles Hughes of residential burglary (Pen. Code, § 459; count 1), two counts of being a felon in possession of a firearm (Pen. Code, § 12021, subd. (a)(1); counts 2 & 5), being a felon in possession of ammunition (Pen. Code, § 12316, subd. (b)(1); count 3), receiving stolen property (Pen. Code, § 496, subd.

(a); count 4), and falsifying a license plate (Veh. Code, § 4463, subd. (a)(1); count 7). The trial court found true allegations that appellant suffered two prior serious felony convictions (Pen. Code, § 667, subd. (a)(1)), two prior strike convictions (Pen. Code, §§ 667, subds. (b)-(i), 1170.12, subds. (a) & (d)), and four prior prison terms (Pen. Code, § 667.5, subd. (b)). The court sentenced appellant to a total prison term of 88 years to life as follows: three consecutive terms of 25 years to life for counts 1, 5, and 7; three concurrent terms of 25 years to life for counts 2, 3, and 4; two consecutive five-year terms for the serious felony priors; and three consecutive one-year terms for the prison priors.

Appellant raises numerous claims of error on appeal. He first contends the trial court erred in denying his motion for acquittal on count 5 because the prosecution failed to prove the corpus delicti of the offense. He next attacks his conviction on count 7 for falsifying a license plate, arguing Vehicle Code[1] section 4463, subdivision (a)(1) did not prohibit his conduct, a more specific misdemeanor statute was applicable, and the court's supplemental instruction on the offense was tantamount to a directed verdict. He also challenges various evidentiary rulings by the trial court, as well as the court's denial of his new trial motion based on some of its adverse evidentiary rulings. Finally, he contends the sentence the court imposed for counts 2, 3, and 4 must be stayed under Penal Code section 654. We reject all but the last contention which respondent concedes. We order the trial court to stay the sentence imposed for count 2, 3, and 4, and otherwise affirm the judgment.

## *FACTS*

In 2008, Bill and Janet Whitla lived on a ranch near the town of Hornitos in Mariposa County.[2] On May 1, around 3:00 p.m., they returned home early from vacation. As they were driving up the driveway to their house, they saw an unfamiliar

---

[1]    Further statutory references are to the Vehicle Code unless otherwise specified.
[2]    Date references in the summary of facts are to 2008 unless otherwise specified.

2

Chevy flatbed truck next to their garage. When Bill drove up next to the truck, Janet recognized appellant as the driver.[3] Appellant said "Rick" in an excited voice and pointed towards the house twice before quickly driving away. As appellant drove away, Janet remarked that it looked like he had some of Bill's equipment from the garage in the back of his truck. Bill turned his vehicle around and started to pursue appellant's truck.

The Whitlas eventually came across appellant's truck abandoned on the side of the road and contacted the sheriff's department through their vehicle's "OnStar" security system. In the meantime, appellant's girlfriend, Tami Turner, drove up. Janet asked Turner if the truck belonged to the man with whom she lived. Turner said something to the effect that the truck belonged to appellant, but he had not been driving it because he was at home with her having a "quickie." When Janet pointed out that appellant was just at her house, Turner told her she was mistaken. Janet did not argue with Turner, in part because Turner appeared to be intoxicated.

After Turner left and sheriff's deputies arrived, the Whitlas identified a number of items in the back of appellant's truck, including an air compressor, a generator, jewelry, a loaded Colt pistol, and various personal items. These items had been taken from the Whitlas' house and garage. Janet estimated the jewelry was worth over $2,000, and Bill estimated the generator and air compressor were worth around $3,000.

In appellant's truck, deputies found bolt cutters, a pry bar, and leather work gloves with fresh sweat stains. Later forensics testing established the bolt cutters were used to cut the chain fastening the air compressor and generator to the wall of the Whitlas' garage. A partial DNA sample extracted from the leather gloves was also consistent with appellant's DNA sample.

In their investigation on May 1, deputies determined the point of entry for the burglary was a door in the garage that opened into the Whitlas' house. The door had a

---

**3**    First names are used for ease of reference only, not out of any disrespect.

window in it and the condition of the door was consistent with someone removing the screen covering, reaching inside the window, and disengaging the door lock, possibly with a pry bar. The garage itself was open to the outside, so that anyone could walk in and see the tools and equipment in the garage.

The day after the burglary and investigation, the Whitlas found a cigarette butt on the floor of the garage, a few feet from the main entrance. They preserved the cigarette butt in a sealed envelope and, the following week, Janet personally delivered the envelope to the main sheriff's office in Mariposa. A DNA sample extracted from the cigarette butt matched appellant's DNA sample.

Rick Skavdahl worked as a caretaker for the Whitlas and lived in a trailer on their ranch. Before they left for vacation, the Whitlas informed Skavdahl of their original plan to return home on May 3. Before returning to their house on May 1, the Whitlas stopped in Hornitos to pick up their mail. They saw Skavdahl in the town plaza and exchanged waves with him.

When deputies went to Turner's house after the burglary to look for appellant, they did not find him. Turner and Skavdahl were both at the house and appeared to be intoxicated.

Appellant was eventually apprehended at Turner's house on May 30. Deputies found him hiding under the bed in the master bedroom. The bedroom was located immediately to the right of the front door of the house. Behind the front door, deputies found a 30/30 rifle in a scabbard, leaning against the wall. To the left of the front door, inside the living room, deputies located a box, which appeared to contain documents belonging to appellant. They also located a suitcase in the living room, which Turner identified as belonging to appellant.

During the drive to jail, appellant made statements which were audio-recorded. In reference to the 30/30 rifle, appellant stated: "I seen a coyote the other night fucking coming up to get the chickens" and "[s]o I took a pretty good shot at him."

4

On the day of appellant's arrest, a white Dodge Caliber was found parked behind Turner's house. A folder and prescription bottle bearing appellant's name were inside the car, and a key to the car was in appellant's pocket.

The Dodge Caliber had a Kansas license plate. The Kansas license plate did not belong to the Dodge Caliber but had been issued to another vehicle that was currently registered in Kansas. The vehicle identification number on the Dodge Caliber revealed it was owned by a Los Angeles rental car company.

During a sheriff's department interview, a detective questioned appellant about the Kansas license plate on the Dodge Caliber. Appellant claimed he "borrowed" the rental car from a "friend" and had planned to return it. But after learning from Turner that the car had been reported stolen, appellant decided to keep it, reasoning, "fucking, I've got to have wheels." The car had California license plates, so appellant asked someone he knew if he could use the Kansas license plate. Appellant explained: "Kansas—he had a plate from Kansas.… And I said, 'Fucking, yeah, let me use that, bud, so then I can fucking kick back and go around and, fuck, travel you know.' So fucking, yeah—so then I hid the car and … shit." Appellant later added, "I didn't change the plates until the fucking—I knew it was reported stolen."

Lillian Donato, a former friend of Turner, testified that Turner bribed her with beer to get her to lie and tell defense counsel and his investigator that she saw someone other than appellant getting out of his truck somewhere near Hornitos.

The parties stipulated that appellant was a convicted felon prior to May 1, and that the Dodge Caliber was reported stolen on May 11.

### The defense

The defense did not dispute that the flatbed truck involved in the burglary belonged to appellant or that the property found in his truck belonged to the Whitlas. The defense theory was that Janet Whitla, who admittedly only viewed the driver for a couple of seconds, misidentified appellant as the person driving his truck. In support of the

5

theory, the defense called an expert witness who testified generally regarding problems with perception, memory, and eyewitness identification. In addition, the defense investigator testified regarding Janet's initial description of appellant and how it omitted details she added in later interviews and in her trial testimony.

The defense investigator further testified that he interviewed Donato in 2008 and 2009. Donato told him she saw appellant's truck parked near the Whitlas' ranch and saw someone other than appellant get out of the driver's door. She described this person as a short, heavy-set White male with short, spiked hair. The first time the investigator heard anything about Turner bribing Donato with beer to come forward with a false alibi was during an interview with Donato in April 2010, right before appellant's trial.

The defense also presented expert testimony that DNA testing excluded appellant as a contributor to DNA samples extracted from a sweatshirt found in appellant's truck and a beanie found inside the Whitlas' garage after the burglary.

Turner testified that, on the morning of the burglary, she and appellant got up around 4:00 or 5:00 a.m. to spray thistle. They returned to the house and were sitting outside around 11:00 a.m., when Skavdahl and a guy Turner knew as "Cheeto" came by. After Skavdahl and Cheeto left, Turner and appellant went to bed, made love, and went to sleep.

At some point, Turner woke up. As she was getting up, she heard what sounded like appellant's flatbed truck. She ran outside and saw the truck going up the road. She ran back inside, where appellant was still sleeping, got dressed and grabbed her keys. She then jumped in her truck to follow appellant's truck.

Turner found appellant's truck crashed into a bank with the Whitlas parked behind it. Turner acknowledged it was appellant's truck and told them appellant was home asleep in bed. She did not remember saying anything about a "quickie."

After speaking with the Whitlas, Turner drove home and woke up appellant. She told him she thought his truck had just been used in a burglary and that the cops were

6

going to be there.  Appellant said he was not going back to prison for something he did not do and took off running.

Turner denied that she tried to bribe Donato to say she saw someone else driving appellant's truck.  Donato volunteered this information on her own.

On May 30, appellant returned to Turner's house in the middle of the night.  He did not take a shot at a coyote with the 30/30 rifle, which had belonged to Turner's father.  There was no ammunition for the rifle in the house.  Turner claimed her friend, Joe Manriquez, brought the rifle down to her house four or five days before appellant's return.

## *DISCUSSION*

### I.     *The prosecution sufficiently established the corpus delicti of count 5*

Appellant contends the trial court erroneously denied his motion for acquittal on count 5 because the prosecution presented insufficient evidence to prove the corpus delicti of the offense of being a felon in possession of a firearm based on the 30/30 rifle found inside of Turner's house.  Particularly, appellant argues that, independent of his extrajudicial statements to the effect he recently used the rifle to shoot at a coyote, there was insufficient evidence he possessed the firearm.

"On a motion for judgment of acquittal under [Penal Code] section 1118.1, the trial court applies the same standard as an appellate court reviewing the sufficiency of the evidence.  The court must consider whether there is any substantial evidence of the existence of each element of the offense charged, sufficient for a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt.  [Citation.]" (*People v. Harris* (2008) 43 Cal.4th 1269, 1286.)  "The sufficiency of the evidence is tested at the point the motion is made.  [Citations.]  The question is one of law, subject to independent review.  [Citation.]" (*People v. Stevens* (2007) 41 Cal.4th 182, 200.)

7

"'The corpus delicti of a crime consists of two elements, the fact of the injury or loss or harm, and the existence of a criminal agency as its cause.' [Citation.]" (*People v. Jennings* (1991) 53 Cal.3d 334, 364.) The law requires these elements to be proven independently of the defendant's statements. (*People v. Ledesma* (2006) 39 Cal.4th 641, 721.) However, "the quantum of evidence required is not great, and 'need only be "a slight or prima facie showing" permitting an inference of injury, loss, or harm from a criminal agency ....' [Citation.] 'The inference [that a crime has been committed] need not be "the only, or even the most compelling, one ... [but only] a *reasonable* one."' [Citation.]" (*Id.* at p. 722.) In other words, the proof necessary to establish the corpus delicti of an offense will be deemed sufficient so long as "it permits an inference of criminal conduct, even if a noncriminal explanation is also plausible. [Citations.]" (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1171.)

Here, the prosecution was required to establish a prima facie showing that a person convicted of a felony owned or possessed a firearm. (*People v. Hilliard* (1963) 221 Cal.App.2d 719, 724.) Proof of possession of a firearm requires knowledge of the firearm and dominion and control over it. (*People v. Pena* (1999) 74 Cal.App.4th 1078, 1083.) Possession may be actual or constructive and may be jointly shared with other persons. (*People v. Jeffers* (1996) 41 Cal.App.4th 917, 922; *People v. Neese* (1969) 272 Cal.App.2d 235, 245; *People v. Nieto* (1966) 247 Cal.App.2d 364, 368.) A person has constructive possession of a firearm that is not in his actual possession when he knowingly maintains, or maintains the right to, dominion and control. (*People v. Pena*, *supra*, 74 Cal.App.4th at p. 1083.) Possession may be established by circumstantial evidence and any reasonable inferences to be drawn from it. (*People v. Williams* (1971) 5 Cal.3d 211, 215.)

We disagree with appellant's argument that the prosecution presented insufficient evidence he had constructive possession of the 30/30 rifle for purposes of establishing the corpus delicti of the offense. Deputies found the rifle behind the front door of Turner's

house. The front door was located immediately next to the master bedroom where appellant was found hiding under the bed. Appellant's presence at Turner's house was not a random occurrence; the two were boyfriend and girlfriend. At the time of the burglary, appellant was living with Turner and occupying the same bedroom. Several weeks later, he returned to stay at Turner's house and hid in the bedroom when the deputies came to look for him. Thus, the evidence at the time of the Penal Code section 1118.1 hearing permitted an inference that appellant knowingly shared with Turner the right to control the 30/30 rifle found at the time of his arrest. The inference appellant constructively possessed the rifle was a reasonable one, even if other explanations—such as those appellant offers on appeal—were equally reasonable. (See *People v. Jacobson* (1965) 63 Cal.2d 319, 327 [corpus delicti requires evidence which creates a reasonable inference that the harm *could have been caused* by a criminal agency, even in the presence of an equally plausible noncriminal explanation of the harm].)

We have reviewed and find inapplicable the decisions appellant cites in support of his argument there was insufficient evidence he had constructive possession of the 30/30 rifle. (See *People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1417-1418 [gun found under mattress in motel room where defendant and another gang member were present]; see also *People v. Johnson* (1984) 158 Cal.App.3d 850 854 [bottles of PCP found hidden in kitchen ceiling at house where defendant and others present].) These decisions do not address the issue here; i.e., whether the corpus delicti of the offense was sufficiently established by evidence other than the defendant's statements. It might very well be that the evidence of constructive possession in this case would have been insufficient *by itself* to support a conviction for being a felon in possession of a firearm. However, as discussed above, the showing necessary to establish the corpus delicti of an offense need only be slight. The trial court correctly concluded that, although the evidence of constructive possession was not overwhelming, it *was* sufficient for purposes of establishing the corpus delicti of the offense of being a felon in possession of a firearm.

Because the corpus delicti of the crime was sufficiently established, the trial court could properly consider the evidence of constructive possession, *plus* appellant's statements describing his recent use of the 30/30 rifle, to conclude there was substantial evidence he committed each element of the offense of being a felon in possession of a firearm. Accordingly, the court did not err in denying appellant's motion for acquittal on count 5.

## II. *Sufficient evidence supports appellant's conviction on count 7*

Appellant contends insufficient evidence supports his conviction on count 7 for falsifying a license plate in violation of section 4463, subdivision (a)(1) (§ 4463(a)(1) because there was no evidence the Kansas license plate he placed on the Dodge Caliber was "false" within the meaning of the statute. According to appellant, the language of section 4463(a)(1) does not prohibit "his act of placing a valid Kansas license plate on a California car." Instead, he interprets the statute as requiring "some action" be "taken to change the license plate." Thus, the issue before us turns on a question of statutory construction.

Section 4463 provides, in pertinent part:

> "(a) *A person who, with intent to prejudice, damage, or defraud, commits any of the following acts is guilty of a felony* and upon conviction thereof shall be punished by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code for 16 months or two or three years, or by imprisonment in a county jail for not more than one year:

> "(1) Alters, forges, counterfeits, or falsifies a certificate of ownership, registration card, certificate, license, license plate, device issued pursuant to Section 4853, special plate, or permit provided for by this code or a comparable certificate of ownership, registration card, certificate, license, license plate, device comparable to that issued pursuant to Section 4853, special plate, or permit provided for by a foreign jurisdiction, or alters, forges, counterfeits, or falsifies the document, device, or plate with intent to represent it as issued by the department, or alters, forges, counterfeits, or falsifies with fraudulent intent an endorsement of transfer on a certificate of ownership or other document evidencing ownership, or *with fraudulent intent displays or causes or permits to be displayed or have*

10

*in his or her possession a blank, incomplete, canceled, suspended, revoked, altered, forged, counterfeit, or false* certificate of ownership, registration card, certificate, license, *license plate*, device issued pursuant to Section 4853, special plate, or permit." (Italics added.)

The elements of the crime, as they were presented in the jury instructions, are as follows: "1. The defendant displayed or caused or permitted to be displayed or have in his possession an altered, forged, counterfeit, or false license plate; [¶] AND 2. The defendant had the specific intent to defraud."

In interpreting a statute, if the language of the statute is not ambiguous, the plain meaning controls. (*People v. Eddards* (2008) 162 Cal.App.4th 712, 717.) We begin with the statutory language because it is generally the most reliable indication of legislative intent. (*Lopez v. Superior Court* (2010) 50 Cal.4th 1055, 1063.) If the statutory language is unambiguous, we presume the Legislature meant what it said. (*People v. Hudson* (2006) 38 Cal.4th 1002, 1009.) Significance should be attributed to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose. (*People v. Black* (1982) 32 Cal.3d 1, 5.) A construction making some words surplusage is to be avoided. (*Ibid.*)

A primary dictionary definition of the word "false" is "adjusted or made so as to deceive." (Webster's 10th Collegiate Dict. (2001) p. 419.) In a similar vein, "false" is defined as "intended or tending to mislead." (*Ibid.*) Thus, the plain meaning of "false" supports the interpretation of "false … license plate" in section 4463(a)(1) to include the placement of a genuine license plate on a car to which it does not belong in order to deceive or mislead such as in this case, where the evidence showed appellant removed the California license plate and placed the Kansas license plate on the Dodge Caliber after he learned the rental car had been reported stolen, in order to drive the car while avoiding detection and restoration of the car to its rightful owner.

Appellant's contrary interpretation that the license plate must be "altered or counterfeited or at a minimum in some[]way invalidated" in order to be "false" would

11

render additional terms in the applicable provision of section 4463(a)(1) mere surplusage, as the language expressly prohibits the display of an "…*altered*, forged, *counterfeit*, or *false* … license plate .…" (Italics added.) Without addressing this basic flaw in his interpretation, appellant invokes various rules of statutory construction and relies on language in other parts of the statute and other Vehicle Code sections to support his narrow interpretation of the term "false" in the provision of section 4463(a)(1) at issue. We find none of his arguments convincing.

In our view, the fact the Legislature listed several ways the relevant provision in section 4463(a)(1) could be violated before concluding with the term "false" strongly suggests it intended for the term to be interpreted broadly, in accordance with its ordinary meaning, to include deceptive displays of a license plate like the one in this case. The term "false" in this context is not ambiguous and a broad interpretation of the term is consistent with the apparent aim of the statute to cover a wide array of fraudulent activities involving evidence of vehicle ownership, identification, and registration.

The evidence in this case was sufficient to support appellant's conviction for violating section 4463(a)(1). For reasons discussed above, appellant's conduct of placing the Kansas license plate on the Dodge Caliber was conduct falling within section 4463(a)(1)'s proscription against the display of a false license plate. Moreover, appellant does not dispute, and the evidence shows, he acted with the requisite intent to defraud. Accordingly, we reject his sufficiency of the evidence challenge to count 7.

### III.    *Appellant was properly prosecuted under section 4463(a)(1)*

Next, appellant contends the prosecution improperly prosecuted him under section 4463(a)(1) because a more specific misdemeanor statute, section 4462.5, applied to his conduct.

Although not explicitly stated, appellant's contention is essentially based on the *Williamson* rule. (*In re Williamson* (1954) 43 Cal.2d 652, 654.) The California Supreme Court recently explained the *Williamson* rule as follows:

12

"…*Under the Williamson rule, if a general statute includes the same conduct as a special statute, the court infers that the Legislature intended that conduct to be prosecuted exclusively under the special statute.* In effect, the special statute is interpreted as creating an exception to the general statute for conduct that otherwise could be prosecuted under either statute. (*Ibid.*) 'The rule is not one of constitutional or statutory mandate, but serves as an aid to judicial interpretation when two statutes conflict.' [Citation.] 'The doctrine that a special statute precludes any prosecution under a general statute is a rule designed to ascertain and carry out a legislative intent. The fact that the Legislature has enacted a special statute covering much the same ground as a more general law is a powerful indication that the Legislature intended the specific provision alone to apply. Indeed, in most instances, an overlap of provisions is determinative of the issue of legislative intent and "requires us to give effect to the specific provision alone in the face of the dual applicability of the general provision … and the special provision …." [Citations.]' [Citation.]

"Absent some indication of legislative intent to the contrary, *the Williamson rule applies when (1) 'each element of the general statute corresponds to an element on the face of the special statute' or (2) when 'it appears from the statutory context that a violation of the special statute will necessarily or commonly result in a violation of the general statute.'* [Citation.] In its clearest application, the rule is triggered when a violation of a provision of the special statute would inevitably constitute a violation of the general statute.…

"On the other hand, *if the more general statute contains an element that is not contained in the special statute and that element would not commonly occur in the context of a violation of the special statute, we do not assume that the Legislature intended to preclude prosecution under the general statute. In such situations, because the general statute contemplates more culpable conduct, it is reasonable to infer that the Legislature intended to punish such conduct more severely.…*" (*People v. Murphy* (2011) 52 Cal.4th 81, 86-87, italics added.)

Invoking these principles, appellant argues his prosecution under section 4463(a)(1) was precluded by section 4462.5, which provides: "Every person who commits a violation of subdivision (b) of Section 4462, with intent to avoid compliance with vehicle registration requirements … is guilty of a misdemeanor." Section 4462, subdivision (b) provides, in pertinent part: "No person shall display upon a vehicle ....

13

any … license plate … not issued for that vehicle or not otherwise lawfully used thereon under this code."

Appellant suggests that a violation of section 4462.5 will necessarily result in a violation of section 4463(a)(1) because they have overlapping mental elements. Thus, appellant asserts: "Section 4462.5 requires the intent [to] avoid compliance with the vehicle registration requirements, or in other words, to defraud the Department of Motor Vehicles, an element subsumed by section 4463's general intent requirement."

Contrary to appellant's assertion, the mental state required by section 4463(a)(1) does not *subsume* the mental state required by section 4462.5. Section 4463(a)(1) requires proof the defendant acted with the specific intent to defraud. As the jury instructions correctly advised, "[s]omeone intends to defraud if he intends to deceive another person either to cause a loss of money, or goods, or services or something else of value or to cause damage to, a legal, financial, or property right." In contrast, section 4462.5 only requires proof the defendant acted "with intent to avoid compliance with vehicle registration requirements." This is not the same as requiring an intent to defraud. Someone may intend to avoid vehicle registration requirements without specifically intending to deceive or cause loss or damage to the Department of Motor Vehicles. Section 4463(a)(1) clearly contemplates more culpable conduct than section 4462.5.[4]

Because a violation of section 4462.5 will not necessarily or commonly result in a violation of section 4463(a)(1), we conclude the *Williamson* rule did not apply to preclude appellant's prosecution under the broader felony statute.

---

[4] We note that, at the defense's request, the trial court instructed the jury on section 4462.5 as a lesser included offense of section 4463(a)(1). The propriety of this instruction is not at issue on appeal. However, in light of this instruction, the jury's guilty verdict on count 7 indicates it found appellant, in displaying the Kansas license plate, acted with the more serious intent to defraud than the mere intent to avoid vehicle registration requirements.

14

*IV. The supplemental instruction was not tantamount to a directed verdict*

During deliberations, the jury asked the trial court for "clarity of false license plate in Vehicle Code section 4463(a)(1)." The court responded to the jury's request for clarification by instructing the jury orally and giving it the following written instruction: "For purposes of Vehicle Code Section 4463(a)(1), a 'false license plate' can be a license plate lawfully issued for one vehicle that is placed onto another vehicle with the intent to defraud another person." Appellant contends the court's definition of "false license plate" so closely tracked the prosecution's evidence that it was tantamount to a directed verdict on that element of the offense and violated his due process and jury trial rights.

A jury instruction relieving the prosecution of the burden of proving, beyond a reasonable doubt, each element of the offense violates the defendant's rights under the federal and California constitutions. (*People v. Flood* (1998) 18 Cal.4th 470, 479-480 (*Flood*).) Such an instruction constitutes error even when the evidence of that element is undisputed. (*People v. Figueroa* (1986) 41 Cal.3d 714, 724.) Thus, in a prosecution for evading a "peace officer," it was error to instruct the jury that the person the defendant evaded was, in fact, a "peace officer." Instead, the jury should have been instructed that police officers are considered "peace officers," leaving it to the jury to determine, on the evidence, whether the person in question was a police officer. (*Flood*, *supra*, 18 Cal.4th at p. 482 & fn. 8.) Similarly, in a prosecution for the sale of unqualified "securities," it was error to instruct the jury that the documents in question were "securities"; instead, the jury should have been instructed on the statutory definition of a "security," so the jury could make the determination with respect to the documents at issue. (*Figueroa*, *supra*, 41 Cal.3d at pp. 734, 740.) In contrast, in a prosecution for creating fraudulent "certificates" within the meaning of section 4463, the trial court did not err in instructing the jury that "smog certificates" constitute "certificates" within the meaning of the statute. In that case, the jury "was still permitted to determine the fact whether or not the

15

exhibits themselves were smog certificates." (*People v. Avanessian* (1999) 76 Cal.App.4th 635, 644-645.)

Under this authority, it is apparent the trial court did not err in instructing the jury that, for purposes of section 4463(a)(1), a "false license plate" could be a license plate lawfully issued for one vehicle that is placed onto another vehicle with the intent to defraud. It would have been error for the court to instruct the jury that the Kansas license plate in question was, in fact, a "false license plate." The court's legally correct instruction properly left it to the jury to make this factual determination. The instruction did not relieve the prosecution of its burden of proof or otherwise violate appellant's constitutional rights.

## V.     *The trial court properly admitted the cigarette butt evidence*

Appellant moved in limine to exclude evidence of the cigarette butt the Whitlas found in their garage the day after the burglary investigation. His written motion asserted, in relevant part:

> "It is believed that seven (7) months earlier, the same Deputy, Deputy Mirelez who assisted Deputy Weaver in the collection of evidence on May 1, 2008, and investigated the crime scene, was called out to the Whitla Ranch for a burglary [of another residence on the property], where Rick Skavdahl, the ranch care taker was a witness who assisted Deputy Mirelez on September 1, 2007. After Deputy Mirelez investigated the scene and left, Janet Whitla found a cigarette butt at the point of entry into the residence. She then mailed that cigarette butt to Deputy Mirelez. Please refer to Exhibit B [Deputy Mirelez's report of the September 1 burglary] and note that both cigarette butts were located near the point of entry at isolated residences. The back doors were the point of entry. The investigation Deputies missed both cigarette butts.
>
> "The sloppy investigation and negligence of Deputies in failing to find these items of evidence while conducting their investigations raised serious doubts that the cigarette butt was actually at the scene on the date of the alleged offense.
>
> "The evidence, or the cigarette butt was not found on the date of the investigation and is not present in any of the photos taken on that date. The

16

prosecution cannot prove that no other persons had access to the garage in between those dates.

"Therefore the defendant respectfully moves that the evidence of the cigarette butt, that defendant had tested and which does contain his DNA, be excluded."  (Bracketed insertion added.)

At a pretrial hearing, the trial court summarily denied appellant's motion to exclude the cigarette butt evidence.

Although no reference was made to Evidence Code section 352 below, appellant now contends the trial court should have excluded the cigarette butt evidence under that code section because the evidence was unreliable and therefore lacked relevance and probative value.  Appellant argues that "because the origin of the cigarette butt was so questionable, its probative value was weak" and the trial court erroneously "permitted the jury to draw the inference that appellant dropped the cigarette during the burglary."

Appellant has failed to demonstrate any error in the trial court's admission of the cigarette butt evidence.  First, none of the authorities he cites involves analogous legal issues.  (See, e.g., *People v. Creegan* (1898) 121 Cal. 554, 559 [court must be satisfied a writing is genuine before admitting it for comparison with other writings whose authenticity is in dispute]; *People v. Allen* (2008) 44 Cal.4th 843, 864 [court retains discretion under Evidence Code section 352 to exclude unreliable hearsay].)

Second, appellant's argument that the cigarette butt evidence was unreliable or untrustworthy is based merely on his theory that the cigarette butts in both the prior and current burglaries were planted by Skavdahl to frame someone else for crimes he committed.  However, the defense offered no evidence, only conjecture, connecting Skavdahl to the cigarette butt evidence in either case.

Moreover, contrary to appellant's assertions, the cigarette butt evidence was relevant and probative.  "Evidence is relevant if it has 'any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' [Citations.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1058.)  In assessing relevance,

17

the test "'"is whether the evidence tends '"logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.'"' [Citation.]" (*Ibid*.)

Here, the cigarette butt was clearly relevant to the issue of identity and was highly probative because it contained appellant's DNA and was found in the victims' garage after the burglary. As appellant recognizes, whether evidence is reliable in the sense of being credible generally goes to its weight and not its relevance. (*People v. Torrez* (1995) 31 Cal.App.4th 1084, 1092.) Thus, the question of whether the cigarette butt was credible evidence that appellant was present in the victims' garage at the time of the burglary was a question properly left for the jury's determination.

Finally, because appellant has not shown the trial court erred in admitting the cigarette butt evidence, we reject his claims that its erroneous admission prejudiced him and violated his federal right to due process.

## VI.     *The trial court properly excluded proffered defense evidence*

In his next three contentions on appeal, appellant contends the trial court erred in excluding certain evidence offered by the defense in support of a theory of third party culpability, and that the error was of constitutional dimension.

### 1.     *Applicable legal principles*

States "'have broad latitude under the Constitution to establish rules excluding evidence from criminal trials.' [Citations.] This latitude, however, has limits. 'Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense."' [Citations.] This right is abridged by evidence rules that 'infring[e] upon a weighty interest of the accused' and are "'arbitrary" or "disproportionate to the purposes they are designed to serve."' [Citations.]" (*Holmes v. South Carolina* (2006) 547 U.S. 319, 324-325.) "While the Constitution thus prohibits the exclusion of defense evidence

18

under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." (*Id.* at p. 326.)

In California, third party culpability evidence is admissible if it is "capable of raising a reasonable doubt of defendant's guilt." (*People v. Hall* (1986) 41 Cal.3d 826, 833 (*Hall*).) "This does not mean, however, that no reasonable limits apply. Evidence that another person had 'motive or opportunity' to commit the charged crime, or had some 'remote' connection to the victim or crime scene, is not sufficient to raise the requisite reasonable doubt. [Citation.] Under *Hall* and its progeny, third party culpability evidence is relevant and admissible only if it succeeds in 'linking the third person to the actual perpetration of the crime.'" (*People v. DePriest* (2007) 42 Cal.4th 1, 43 (*DePriest*).)

Courts "should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible ([Evid. Code,] § 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion ([Evid. Code,] § 352)." (*Hall*, *supra*, 41 Cal.3d at p. 834.) Under Evidence Code section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." The trial court enjoys broad discretion in determining whether to admit evidence under Evidence Code section 352 and its exercise of discretion must not be disturbed on appeal unless arbitrary, capricious or patently absurd and resulting in a manifest miscarriage of justice. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)

### 2. *The trial court properly excluded Arteaga's hearsay statements*

During a pretrial hearing, defense counsel indicated he planned to introduce statements made by Humberto Arteaga (also known as "Cheeto") on the day of the

19

burglary to the effect he wanted to borrow appellant's truck. Arteaga was apparently unavailable to testify because he had been deported. The prosecutor stated he would object to the introduction of Arteaga's statements on hearsay grounds. Defense counsel responded, "That's present sense state of mind exception, 'Can I borrow your truck.'" The trial court did not rule on the admissibility of Arteaga's statements at that time but indicated there could be an "[Evidence Code, section] 352 problem."

During the prosecution's case, Janet and Bill Whitla both testified that they had met appellant prior to the burglary when Turner brought him to their house seeking work. Bill testified he did not hire appellant because "anybody going to work for me, they can't have a criminal record." On cross-examination, Bill testified he was unaware Arteaga, who had worked for him in the past hauling scrap, had a criminal record.

The issue of Arteaga's hearsay statements arose again during Turner's testimony. When asked if anybody else, besides Skavdahl, came to her house the morning of the burglary, Turner testified, "This guy named Cheeto that had been scrapping at the Whitlas came by and wanted to borrow [appellant's] flatbed." The trial court interjected: "Wait just a minute. It is hearsay. If the defendant wants to take the stand and testify about the colloquy he had with Cheeto, he can do that. Otherwise, it's hearsay." Defense counsel asserted Cheeto's request to borrow the truck went to "[s]tate of mind." The court ruled it would not permit the line of inquiry and granted the prosecutor's motion to strike Turner's testimony.

Appellant contends the trial court erred by not admitting Arteaga's statements under the state of mind exception to the hearsay rule (Evid. Code, § 1250). Evidence Code section 1250 provides, in relevant part, that "a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule" when offered (1) to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action,

20

or (2) to prove or explain acts or conduct of the declarant. (Evid. Code, § 1250, subd. (a)(1), (2).)

Evidence Code section 1250 codifies the California Supreme Court's decision in *People v. Alcalde* (1944) 24 Cal.2d 177 (*Alcalde*), which addressed the admissibility of what the high court referred to as "declarations of intent to do an act in the future." (*Alcalde*, *supra*, 24 Cal.2d at p. 187.) Specifically, in *Alcalde*, the Supreme Court addressed the admissibility of a decedent's statement that she was planning to go out with a man named Frank, the defendant's nickname, on the night she was killed. (*Alcalde*, *supra*, 24 Cal.2d at pp. 187-188.) The high court held that the elements essential to admissibility of the decedent's statement were that (1) "the declaration must tend to prove the declarant's intention at the time it was made," (2) "it must have been made under circumstances which naturally give verity to the utterance," and (3) "it must be relevant to an issue in the case." (*Id.* at p. 187.) Applying this three-prong test, the *Alcalde* court concluded that the decedent's statement was admissible because "it was a natural utterance made under circumstances which could create no suspicion of untruth in the statement of her intent" (*id.* at pp. 187-188), and "[u]nquestionably the deceased's statement of her intent and the logical inference to be drawn therefrom, namely, that she was with the defendant that night, were relevant to the issue of the guilt of the defendant." (*Id.* at p. 188; see also *People v. Majors* (1998) 18 Cal.4th 385, 404-405 (*Majors*) [witness statement that victim said he was going to conduct a drug deal with people from Arizona on the night he was killed admissible as declaration of intent to do future act].)

Relying on *Alcalde* and *Majors*, appellant argues that Turner's testimony that Arteaga wanted to borrow appellant's truck was admissible because "the jury could infer from Arteaga's declared intent to use the truck that he later drove the truck to commit the burglary." The Supreme Court's decisions are not analogous to this case. Unlike the victims' statements in *Alcalde* and *Major,* Arteaga's proffered statements said nothing

21

about what he was planning to do at the time the crime was committed.  The most we can infer about his mental state is that he desired to borrow appellant's truck *at the time* the statements were made; i.e., in the morning, approximately four hours prior to the burglary.  (See *People v. Whitt* (1990) 51 Cal.3d 620, 642-643 ["The exception is limited to out-of-court statements describing a relevant mental state being experienced by the declarant *at the time* the statements were made."].)  Because Arteaga's statements did not constitute a declaration of an intent to do an act in the future, and his state of mind the morning of the burglary was not shown to be relevant to any of the issues in the action, Arteaga's hearsay statements were not made admissible by Evidence Code section 1250 or the Supreme Court's reasoning in *Alcalde* and *Major*.

Appellant nonetheless suggests it was logical to infer from Arteaga's statements requesting to borrow appellant's truck that Arteaga actually drove the truck at the time of the burglary because "[a]s in *Majors*, there were corroborating circumstances point[ing] to Arteaga's guilt."  The so-called corroborating circumstances appellant cites are these: (1) Arteaga's presence at Turner's residence on the morning of the burglary; (2) Arteaga's familiarity with the Whitlas' property; (3) Turner's testimony that she and appellant were in bed when she heard appellant's truck drive up the hill; and (4) testimony by Bill Whitla that Arteaga never returned power equipment he loaned to him.

However, none of the forgoing circumstances directly implicated Arteaga in the instant burglary or led to a logical inference that Arteaga, in appellant's words, "took [the truck] when appellant refused to let him borrow it."  Moreover, because the proffered evidence did not link Arteaga "to the actual perpetration of the crime" in this case (*DePriest*, *supra*, 42 Cal.4th at p. 43), its exclusion did not deny appellant his constitutional right to present a third party culpability defense.  For all these reasons, we reject appellant's claim that the court erred in excluding Turner's testimony regarding Arteaga's hearsay statements.

22

### 3. *The trial court properly excluded evidence of prior burglary*

Appellant moved in limine to admit evidence that an unoccupied house located on the Whitlas' ranch was burglarized in September 2007, when appellant was incarcerated. During the hearing on the motion, defense counsel argued there were "striking similarities" between the prior burglary and the instant burglary. Defense counsel noted the prior burglary involved a "similar point of entry" and "[t]here was a similarity with the cigarette butt that was not found on the date of the investigation by the same officers involved in this investigation and was found, in fact, a day later."

The parties further debated the issue of the admissibility of evidence of the prior burglary, in relevant part, as follows:

> "THE COURT: Let me ask a question, [defense counsel]. Is there something unique about the method of entry on these two burglaries separated by some 10 months or so in time, modus operandi or something that is unique or distinctive or is it simply just a couple of places where entry was forced and stuff was taken?
>
> "[DEFENSE COUNSEL]: It's my understanding, such as the reports that I have read, that the entry was through a back door with the window pried open. That, in fact, the day following, not the day of the investigation was done, but the day following, we have another cigarette butt that appears near the point of entry.
>
> "THE COURT: In which case?
>
> "[DEFENSE COUNSEL]: In both of them.
>
> "THE COURT: Okay.
>
> "[DEFENSE COUNSEL]: In both of them. It's also pertinent to me because Mrs. Whitla, who—I believe it was her mother's residence; am I correct?
>
> "THE COURT: Which one?
>
> "[DEFENSE COUNSEL]: The first one—
>
> "THE COURT: Okay.

23

"[DEFENSE COUNSEL] —was her mother's residence, but her mother is now deceased, so the house was not occupied at the time, but all of the property was still there. So, it was broken into, personal property was taken.… [¶] … [¶]

"[THE PROSECUTOR]: I just wanted to … point out to the Court that this thing about the cigarette butt, I find that to be completely irrelevant in this sense, the cigarette butt in our case on the burglary on May 1st, 2008, Department of Justice tested that cigarette butt. It came back with the defendant's DNA profile. So the fact that there was another cigarette butt in this prior burglary, 2007, again the People find it completely irrelevant.

"[DEFENSE COUNSEL]: It's not irrelevant at all if Rick Skavdahl is planting these cigarette butts trying to put this on somebody else. It's very relevant. Because the fact of the matter is after this offense, the Sheriff's office transported Mr. Skavdahl back to his place on the Whitla property where [appellant] had visited with him and had smoked cigarettes and left them outside of his place. And so now, we have, magically, the same guy around.

"And incidentally, [appellant] is in jail when the first offense occurs. Okay. He's still in prison. He's nowhere around to even possibly be involved in that, but the common denominator— [¶] … [¶] So that's—it's our argument that the cigarette butts are plants, possibly planted there.

"THE COURT: Other than speculation and conjecture, is there any other evidence to indicate that?

"A lot of people smoke cigarettes.… [¶] … [¶]

"[DEFENSE COUNSEL]: Well, it would be interesting to know why they didn't DNA test the other one.

"THE COURT: Well, that's a different burglary, a different situation. It was not an occupied dwelling. [¶] … [¶]

"[THE PROSECUTOR]: …[A]s far as I know, the Sheriff's investigation was—they never sent it to my office for prosecution. [¶] … [¶]

"[DEFENSE COUNSEL]: Let me add a word to that. In that case, the Sheriff's investigation was inept and problematic as it is in this case, and that's what we have a right to show. [¶] … [¶]

24

"THE COURT: Any response on your part other than what you have offered so far, [defense counsel]?

"[DEFENSE COUNSEL]: No, other than, I think, the reports that I have seen indicate that it was Mrs. Whitla that found the cigarette the day after the first one as well.

"THE COURT: Do you have anything to suggest that Mrs. Whitla has any motivation to frame your client?

"[DEFENSE COUNSEL]: I don't think that Mrs. Whitla is trying to frame my client, I think somebody else is. And somebody else was trying to implicate somebody else in that case who wasn't involved.

"THE COURT: And who do you suspect that might be?

"[DEFENSE COUNSEL]: I think, your Honor—

"THE COURT: Mr. Skavdahl?

"[DEFENSE COUNSEL]: —that Mr. Skavdahl is involved in some way in both of these offenses.

"THE COURT: People have any evidence or information that suggests that that may be the case or not, Skavdahl may have been complicit in either of these events? [¶] … [¶]

[THE PROSECUTOR]: I mean, I guess anything is possible. I mean, he's the caretaker on the property, you know, so to say that if the Court is asking me is it impossible, no, so definitely is possible.

"THE COURT: Okay. If I understand the posture of your case, you have Mrs. Whitla identifying the defendant leaving the property on the date of the burglary, correct?

"[THE PROSECUTOR]: That's correct.

"THE COURT: And we don't have any representation by the defense that Mrs. Whitla is somehow personally conspiring to frame Mr. Hughes or there's no interpretation of the evidence that suggests she is other than a citizen witness that's relating what she observes. [¶] … [¶]

"[DEFENSE COUNSEL]: I'm certainly not indicating that we think Mrs. Whitla burglarized her own house or her mother's house. Okay.

"THE COURT: Right.

25

"[DEFENSE COUNSEL]: But I think if the possibility exists that somebody else is involved and would have some evidence of that that is credible, that is probative under the Code, we should be entitled to put it in, okay, the jury should hear it.

"THE COURT: The issue will stand submitted. And I am going to conclude on the [Evidence Code section] 352, with all due respect to the defense, that I'm not sold that this is not a case where the—going into this with several witnesses and trying to show the burglary some eight or nine months before on the property that's separated by a half mile and with a not uncommon form of entry, a forced back door or through a window. And we both heard a number—all of us have heard a number of burglary cases. That's not an uncommon phenomenon, back doors as opposed to front because they're out of view of the public. There's nothing unique about the circumstances of the case. There is nothing more than conjecture that Mr. Skavdahl or anyone else has anything else to do with it. [¶] … [¶] I'm going to conclude under [Evidence Code section] 352 that it would involve undue consumption of time and it stands the chance of being unduly misleading to the jury."

Appellant contends the trial court abused its discretion and violated his right to present a complete defense by excluding the evidence of the prior burglary. Appellant argues the evidence was admissible under Evidence Code section 1101, subdivision (b), to show "Skavdahl's motive and common plan to commit the current burglary." Appellant asserts he met his burden of showing the evidence was admissible by demonstrating the following:

"Here the burglaries were only a few months apart on the same victim's property when Skavdahl knew the residents would be absent. The method of entry was the same in both burglaries—through a back door with the windows pried open. In both cases, a partially smoked cigarette appeared the day after the burglary. Appellant theorized that Skavdahl planted the cigarettes in order to deflect suspicion from himself. Thus, the burglaries were substantially similar and evidenced a common scheme."

Evidence Code section 1101 provides, in relevant part: "(a) Except as provided in this section … evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified

26

occasion.  [¶]  (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident ....).”

"'To be admissible to demonstrate a distinctive modus operandi, the evidence must disclose common marks or identifiers, that, considered singly or in combination, support a strong inference that the defendant committed both crimes.  [Citations.]’ [Citation.]”  (*People v. Carter* (2005) 36 Cal.4th 1114, 1154-1155.)  "In order to be relevant as a common design or plan, ‘evidence of uncharged misconduct must demonstrate "not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations."’  [Citation.]”  (*People v. Catlin* (2001) 26 Cal.4th 81, 111.)  "Reaching a conclusion that offenses are signature crimes requires a comparison of the degree of distinctiveness of shared marks with the common or minimally distinctive aspects of each crime.  [Citations.]”  (*People v. Bean* (1988) 46 Cal.3d 919, 937.)

We agree with respondent that there were no unique factors in the two burglaries sufficient to support a strong inference they were committed by the same person in accordance with a common scheme.  Appellant essentially offered only two points of similarity to connect the prior and instant burglaries; i.e., the method of entry and the discovery of cigarette butts the following day.  However, as the trial court observed, it is not uncommon, in the context of a residential burglary, for a burglar to enter a house by forcing open a back door or window.  Nor is the presence of a cigarette butt a particularly distinctive feature as many people smoke cigarettes.  As already discussed, appellant offered no evidence, only conjecture, supporting his theory that Skavdahl planted the cigarette butts to frame other people for his crimes.  Because the first burglary was not shown to share sufficient common features with the instant burglary, the court did not err

27

in ruling evidence of the first burglary was not admissible under Evidence Code section 1101, subdivision (b).

We also reject appellant's claim the trial court's ruling violated his right to present a complete defense. The cases appellant cites to support his claim are inapposite. (See *People v. Reeder* (1978) 82 Cal.App.3d 543, 449-554 [erroneous exclusion of codefendant's prior acts of misconduct offered to show defendant disliked codefendant too much to engage in narcotics dealings with him]; *People v. Taylor* (1980) 112 Cal.App.3d 348, 362-366 [erroneous exclusion of victim's suicide declarations].) Unlike in the cases appellant cites, the court's exercise of discretion under Evidence Code section 352 in this case did not result in the exclusion of evidence of significant probative value.

### 4. *The trial court properly excluded Skavdahl's hearsay statements*

Skavdahl, who was subpoenaed by the defense, invoked his Fifth Amendment privilege not to testify. Consequently, the defense sought to introduce, through the testimony of three jail inmates, statements Skavdahl purportedly made in jail following his arrest on an unrelated weapons charge in June 2008. The defense argued Skavdahl's statements were admissible as statements against his penal interest under Evidence Code section 1230. The court granted the defense's motion as to one of the inmates, Adam Drennen, and denied it as to the other two, Dari Russel and Luis Vasquez. The defense ultimately decided not to call Drennen "as a tactical matter."[5] Therefore, only the proffered testimony of Russel and Vasquez is at issue in this appeal.

---

[5]   Upon further inquiry by the trial court, defense counsel stated: "It's not that I don't believe his testimony, I just feel like his testimony, without the buttressing testimony of the other two witnesses that the Court has excluded, would lack the credibility and the corroboration that would need to be able to withstand any rebuttal witnesses that might testify about statements made to them." Defense counsel added that Drennen "had apparently been drinking some" and "wasn't dressed appropriate to come to court either."

28

The proffered testimony of Russel was that he heard Skavdahl say "he worked on a cattle ranch somewhere in Hornitos" and "how his boss got ripped off and how some guy that didn't do it was getting blamed and how he was worried also that he, himself, might get blamed, for some reason."  Vasquez's proffered testimony was that, when the local newspaper came into the jail with a story about appellant's arrest, he heard Skavdahl say "they were going after the wrong guy."

Appellant contends the trial court erroneously concluded that the statements overheard by Russel and Vasquez were inadmissible under Evidence Code section 1230, as statements against Skavdahl's penal interest.  According to appellant, "Skavdahl's statement that the police were chasing the wrong guy for the May 1, 2008 [burglary] could potentially subject him to criminal liability because he told the police that he didn't know who did it but thought appellant might be involved."

Evidence Code Section 1230 codifies an exception to the hearsay rule for a declaration against interest.  A hearsay statement qualifies as a declaration against penal interest if it could subject the declarant to the risk of criminal liability to such an extent that a reasonable person in the same position would not have made the statement unless he or she believed it to be true.  (Evid. Code, § 1230; *People v. Brown* (2003) 31 Cal.4th 518, 536; *People v. Duarte* (2000) 24 Cal.4th 603, 610.)  The proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made, and the declaration was sufficiently reliable to warrant admission despite its hearsay character.  (*People v. Duarte*, *supra*, 24 Cal.4th at pp. 610-611.)

"[T]o satisfy the requirements of section 1230 of the Evidence Code and the confrontation clause of the United States Constitution, a declaration against penal interest must be '*distinctly*' against the declarant's penal interest [citation] and must be clothed with indicia of reliability."  (*People v. Shipe* (1975) 49 Cal.App.3d 343, 354, italics added.)  "In the absence of any legislative declaration to the contrary," this hearsay

29

exception is "inapplicable to evidence of any statement or portion of a statement not itself specifically disserving to the interests of the declarant." (*People v. Leach* (1975) 15 Cal.3d 419, 441, fn. omitted.)

Here, the statements attributed to Skavdahl were not specifically disserving of his penal interest. He merely expressed an opinion that the police had the wrong person for the burglary without providing any details explaining why this was his opinion. He did not implicate himself in the burglary or in any other criminal activity. Appellant's theory that Skavdahl's statements could *potentially* subject him to criminal liability because he made contradictory statements to the police does not satisfy the requirements of Evidence Code section 1230. The statements were not *distinctly* against Skavdahl's penal interest. Therefore, the court did not err in finding inapplicable the hearsay exception for statements against penal interest. Nor did the court's ruling violate appellant's right to present a third party culpability defense the statements did not link Skavdahl to the actual perpetration of the burglary. (See *DePriest, supra,* 42 Cal.4th at p. 43.)

## VII.  *The denial of appellant's new trial motion was not an abuse of discretion*

Appellant contends the trial court abused its discretion when it denied his new trial motion arguing the court's adverse evidentiary rulings prejudiced appellant's ability to present a third party culpability defense. For reasons already discussed, we reject appellant's contention. Contrary to his assertions, the proffered evidence of the prior burglary and the hearsay statements of Arteaga and Skavdahl failed to link either man to the actual perpetration of the burglary in this case. Therefore, the exclusion of this evidence did not deny appellant his right to present a defense or irreparably damage his chances of receiving a fair trial as he contends.

## VIII.  *The sentence imposed for counts 2, 3, and 4 must be stayed under Penal Code section 654*

Appellant contends, and respondent concedes, that his sentence for count 2 (felon in possession of firearm) and count 3 (felon in possession of ammunition) must be stayed

under Penal Code section 654 because his possession of Bill Whitla's Colt pistol and the ammunition with which it was loaded were an indivisible part of the burglary (count 1). We accept respondent's concession as properly made. (*People v. Bradford* (1976) 17 Cal.3d 8, 22 [Penal Code section 654 applies where defendant's possession of firearm not antecedent and separate from primary offense].) Likewise, appellant contends, and respondent properly concedes, that his sentence for count 4 (receiving stolen property) must be stayed under Penal Code section 654 because his receipt of stolen property was an indivisible part of the burglary. (*People v. Allen* (1999) 21 Cal.4th 846, 866 [Penal Code section 654 applies where stolen property defendant received was property defendant stole in burglary].)

## *DISPOSITION*

The sentence imposed for counts 2, 3, and 4 is ordered to be stayed pursuant to Penal Code section 654. In all other respects, the judgment is affirmed. The superior court is ordered to prepare an amended abstract of judgment and to transmit a copy of it to the appropriate authorities.

_____
HILL, P. J.

WE CONCUR:


_____
LEVY, J.


_____
CORNELL, J.

31